Christopher A. Slater, OSB # 97398
cslater@slaterross.com
Michael J. Ross, OSB # 91410
mjross@slaterross.com
SLATER ROSS
Sovereign Hotel, 4th Floor
710 S.W. Madison Street
Portland, Oregon  97205
Telephone: (503) 227-2024
Facsimile: (503) 224-7299

*Local Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| In re GALENA BIOPHARMA INC. DERIVATIVE LITIGATION | Case No.: 3:14-cv-382-SI LEAD 3:14-cv-514-SI 3:14-cv-516-SI |
| This Document Relates To: ALL ACTIONS. | **PLAINTIFFS' VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT** **JURY TRIAL DEMANDED** |

## VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Lead Plaintiff Jeffrey Klein ("Klein") and Plaintiff Pratik Rathore ("Rathore") (collectively, "Plaintiffs"), by and through their undersigned attorneys, hereby submits this Verified Second Amended Consolidated Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Galena Biopharma, Inc. ("Galena" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from

July 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      This case is about a classic "pump and dump" insider trading scheme perpetrated by Galena insiders, including directors and senior officers, in violation of their fiduciary duties of loyalty and good faith to the Company and its shareholders.

3.      According to its public filings, Galena is a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care.  The Company's lead product candidate has always been NeuVax™ (nelipepimut-S) ("NeuVax"), a vaccine for preventing or delaying breast cancer recurrence after standard of care treatment, which is in Phase 3 clinical trials.

4.      Defendants have admitted that NeuVax is the Company's lead product.  By 2013, however, analysts were beginning to seriously question the financial success of this product. Defendants knew the meaning of this – if NeuVax was lackluster, so was Galena.  And this fact would be reflected in Galena's share price.  For instance, the Company's stock went from trading at a high of around $7.70 per share in 2010 to under $2 per share at the beginning of 2013.

5.      In July 2013, Defendants hired a subsidiary of the stock promotion firm the DreamTeam Group ("DreamTeam") to begin a misleading marketing campaign designed to boost the Company's stock price.[1]  The plan (which was not disclosed to Galena's stockholders) was simple, and would be executed in two main parts.  First, the DreamTeam would post and publish misleading articles and comments on investor websites, touting the supposed strength of Galena and its products.  Second, when the share price was high enough (and while Defendants

---

[1] Upon information and belief, MissionIR was the affiliate of DreamTeam that the Defendants entered into the agreement with.  For purposes of this complaint, DreamTeam will be referring to any entity and/or affiliate of that firm.

were armed with material, adverse, non-public information), Defendants would unload massive amounts of their personally held stock, and would continue to do so for as long as the ruse continued (which is to say, for as long as the share price was artificially elevated).

6.     From then on, as a result of the Defendants' deal with the DreamTeam, the DreamTeam published a variety of "articles" on third party websites (such as *Seeking Alpha.com* ("*Seeking Alpha*")), under multiple aliases, which promoted Galena's stock.  At no time did these "articles" ever disclose that Galena had paid for the promotion.  After it was revealed that several of these "articles" were written by the same person (using multiple aliases), the articles were removed from the site without the disclosure of the paid marketing relationship with Galena.[2]

7.     By early January 2014, phase one of the Defendants' scheme was complete.  Due to the Defendants' illicit actions, Galena's stock price had risen significantly.  For reference, in October 2013, Galena's stock price traded at prices between $2 per share and $3 per share.  By January 2014, however, due to the defendants' illicit stock promotion scheme, Galena's stock price was trading at an artificially inflated price of between $5 per share and $7 per share.  With phase one of the scheme complete, it was time for the defendants to pursue phase two: cashing in by selling massive amounts of their personally held Galena stock at artificially inflated prices.

8.     In a period of ***less than one month***, between January 17, 2014 and February 12,

---

[2] Most egregiously, immediately after hiring of the DreamTeam, Defendants sought to protect themselves from their transgressions by attempting to enact a forum-selection clause (the "Clause") in Galena's corporate Bylaws ("Bylaws").  As discussed herein, however, pursuant to Delaware law, a board of directors is unable to unilaterally amend a corporation's bylaws unless specifically allowed for in the company's certificate of information.  *See* DEL. CODE ANN. Tit. 8, § 109(a).  Importantly, Galena's operative Articles of Incorporation, entitled "Amended and Restated Certificate of Incorporation of Galena Biopharma, Inc. (formerly RXi Pharmaceuticals Corporation), as amended as of June 28, 2013" (the "Certificate of Incorporation") contains no such provision whatsoever and, instead, requires a shareholder vote with no less than 75% approval for any amendment to the Bylaws.  A true and correct copy of the Certificate of Incorporation is attached hereto as Exhibit A.

2014 (a period consisting of just eighteen trading days), and while in possession of material, adverse, non-public information, certain of the Defendants (including six members of the Board) sold over *2.9 million shares* of their personally held Galena stock, collectively reaping proceeds of over *$16 million*.  Upon information and belief, none of these senior Galena insiders had engaged in open market sales of Galena stock in the four years prior to January 2014, and none have sold any shares subsequent to February 12, 2014 (which is to say, during and subsequent to the unraveling of the scheme).

9.    On February 12, 2014, Defendants' scheme began to unravel.  On that day, *TheStreet.com* ("*The Street*") published an article authored by journalist Adam Feuerstein ("Feuerstein") detailing Defendants' payments to the DreamTeam to artificially inflate the Company's stock price, and the defendants' subsequent illicit insider sales.  On this news, shares of Galena fell by $0.85 per share, or 16%, to close at $4.34 per share on February 12, 2014.

10.   Two days later, on February 14, 2014, Defendants caused the Company to issue a statement on behalf of Mark J. Ahn ("Ahn"), Galena's then-President and Chief Executive Officer ("CEO"), which was purportedly "to set the record straight."  Therein, defendant Ahn, who was also a member of the Board, categorically denied any wrongdoing by himself or by other Galena insiders.  Among other things, Ahn represented to Galena shareholders that the report issued by *The Street* was "tabloid-like" and "largely devoid of true information." According to defendant Ahn, "[t]he only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged the DreamTeam Group and that insiders at the company, including me, divested shares in mid January.  All other accusations in this article – as with his prior reporting on Galena – are specious and conveniently arranged to create controversy."

11.     Accordingly, at a minimum, defendants **_admitted_** to hiring DreamTeam to bolster the Company's stock price and **_admitted_** to divesting massive numbers of Galena shares while the Company's stock price was inflated.  On this news, Galena shares declined by $0.63 per share, or over 14%, to close at $3.73 per share on February 14, 2014.

12.     In March 2013, the Board disclosed that beginning in February 2014, the U.S. Securities and Exchange Commission (the "SEC") commenced an investigation regarding "certain matters relating to our company and an outside investor-relations firm that we retained in 2013."  The SEC investigation remains ongoing.

13.     The Board would also later disclose that on February 17, 2014, despite allegedly "setting the record straight" for shareholders only three days earlier, it created a so-called "Special Committee," which consisted of four directors of Galena, to investigate the potential wrongdoing.

14.     Upon information and belief, the Special Committee was initially comprised of defendants William Ashton ("Ashton"), Stephen Galliker ("Galliker"), Sanford Hillsberg ("Hillsberg"), and Steven Kriegsman ("Kriegsman").  In March 2013, non-defendant Irving M. Einhorn ("Einhorn") joined the Board and became the fifth member of the Special Committee.

15.     Importantly, the members of the Special Committee lacked the necessary requirements of independence and the ability to conduct a reasonable investigation.  As an initial matter, three of the five Special Committee members (Galliker, Hillsberg, and Kriegsman) were amongst the top Company insiders who personally sold Galena shares during the eighteen trading day period leading up to _The Street_'s February 12, 2014 report.  Additionally, one of the Special Committee members, defendant Kriegsman, hired DreamTeam for "promotional services" on behalf of another company called CytRx Corp. ("CytRx"), of which defendant

Kriegsman is the CEO and a director.  Defendant Kriegsman and CytRx are now being sued for securities fraud in connection with DreamTeam's similarly misleading stock promotion campaign for that company.  *See Chen v. CytRx, et al.*, No. CV14-1956-GHK (C.D. Cal.).  Further, another Special Committee member, defendant Galliker, serves as Chief Financial Officer ("CFO") of a company called Kindred Biosciences, Inc. ("Kindred Bio"), which also contracted with DreamTeam for "promotional services."    Additionally, Defendants have admitted that defendant Ashton is not independent.  Finally, Special Committee member and Chairman of the Board, defendant Hillsberg, is conflicted since he is managing partner of the law firm TroyGould PC ("TroyGould") that is counsel to Galena, and also to DreamTeam clients CytRx and Kindred Bio, ***the officers of which sit, with Hillsberg, on the Special Committee***.  Significantly, defendants have disclosed that in 2012 and 2013, the Company paid TroyGould $534,932 and $701,126 in legal fees, respectively.[3]

16.    On March 13, 2014, *Seeking Alpha* published an article entitled "Behind the Scenes with Dream Team, CytRx and Galena" that specifically detailed Defendants' illicit stock promotion scheme accomplished with the DreamTeam.  Specifically, the article was written by an author, Richard Pearson, who was personally approached by DreamTeam to write favorable articles about Galena.  Mr. Pearson's article illustrated how the stock promotion scheme worked and confirmed, among other things, that Defendants had approved all articles written about Galena prior to their publication.

17.    On August 11, 2014, Defendants caused the Company to file its quarterly report on Form 10-Q for the second quarter of 2014.  Therein, Defendants confirmed that the SEC's investigation remained ongoing, and disclosed that the previously-formed Special Committee

---

[3] Upon information and belief, CytRx and Kindred Bio likewise paid substantial attorneys' fees in connection with services rendered by TroyGould.

had completed its investigation.  Defendants did not disclose, however, the conclusions reached by the Special Committee, or what actions (if any) have been taken.

18.    Moreover, in an apparent acknowledgment that the Special Committee was and is not independent and disinterested, and an effective admission that pre-suit demand on the Board was not required, the Board disclosed on August 11, 2014 that it had appointed defendant Einhorn to serve as a one-member special litigation committee (the "Special Litigation Committee" or "SLC") under Delaware law.  Specifically, Defendants stated: "on July 21, 2014, our board appointed Irving M. Einhorn as a special litigation committee in order to make any and all determinations with respect to the complaints and take all actions he deems necessary or appropriate regarding the claims made in the complaints."  The Company's announcement was shocking given Einhorn obviously lacked the independence required of a single-member SLC as he was part of the previously-constituted Special Committee that completed an investigation into the alleged wrongdoing, and in that role, Einhorn had already reached conclusions in connection the alleged claims.

19.    On August 21, 2014, *The Street* reported, based on the account of "a source close to the company," that defendant Ahn was "fired" by the Board at a "special meeting" held on August 18, 2014.  Contrary to this media report that Ahn was terminated, however, the Board issued a press release on August 21, 2014 in which the Board claimed that Ahn purportedly "resigned as the President and CEO and as a director of the company to pursue other long held personal and professional goals."

20.    To date, the Board has made no disclosures clarifying whether defendant Ahn was fired or resigned.

21.    As a result of Defendants' pervasive breaches of their fiduciary duties of loyalty

and good faith, the Company has been damaged.  In addition, the price of the Company's stock still has not recovered and currently trades for around $2 per share.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between Plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District.  Further, defendants regularly conduct business in this District and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

24.     Plaintiff Klein is a current shareholder of Galena, and has continuously held Galena stock since June 7, 2013.  Klein is a citizen of Virginia.

25.     Plaintiff Rathore is a current shareholder of Galena, and has continuously held Galena stock since January 13, 2014.  Rathore is a citizen of Indiana

26.     Nominal defendant Galena is a Delaware corporation, with its principal executive offices at 4640 SW Macadam Avenue, Suite 270, Portland, Oregon 97239.  According to its public filings, Galena is a biopharmaceutical company developing and commercializing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care.

27.     Defendant Ahn served as the Company's President and CEO from March 31, 2011 until his purported "resignation," announced on August 21, 2014.   Additionally, Ahn served as a director of the Company from 2007 until August 21, 2014.  Upon information and belief, defendant Ahn is a citizen of Oregon.

28.     Defendant Ryan Dunlap ("Dunlap") has served as the Company's Vice President and CFO since July 2012.   Upon information and belief, defendant Dunlap is a citizen of Oregon.

29.     Defendant Mark W. Schwartz ("Schwartz") was appointed the Company's President and CEO, "effective immediately," on August 21, 2014.   Previously, defendant Schwartz previously served as the Company's Executive Vice President and Chief Operating Officer ("COO") from April 2011 until August 21, 2014.   Upon information and belief, defendant Schwartz is a citizen of Oregon.

30.     Defendant Hillsberg has served as Chairman of the Board since 2007. Additionally, defendant Hillsberg served as a member of the Special Committee.   Further, defendant Hillsberg serves as managing partner of TroyGould, which has received over ***$1.2 million*** in fees from Galena during 2012 and 2013.  Additionally, upon information and belief, TroyGould likewise has received substantial attorneys' fees from CytRx and Kindred Bio. Finally, defendants have admitted that defendant Hillsberg is not independent.  Upon information and belief, defendant Hillsberg is a citizen of California.

31.     Defendant Richard Chin ("Chin") has served as a director of the Company since 2009.  In addition, defendant Chin served as a member of the Board's Audit Committee (the "Audit Committee"), as a member of the Board's Nominating and Corporate Governance Committee (the "Governance Committee"), and as a member of the Board's Compensation

Committee (the "Compensation Committee") during the Relevant Period.  Upon information and belief, defendant Chin is a citizen of California.

32.    Defendant Galliker has served as a director of the Company since 2007.  In addition, defendant Galliker served as Chair of the Audit Committee and as a member of the Governance Committee during the Relevant Period.  Further, defendant Galliker served as a member of the Special Committee.  Finally, defendant Galliker currently serves as CFO of Kindred Bio, which has engaged in business with both the DreamTeam and TroyGould.  Upon information and belief, defendant Galliker is a citizen of Florida.

33.    Defendant Kriegsman has served as a director of the Company since 2006.  In addition, defendant Kriegsman served as Chair of the Compensation Committee during the Relevant Period.  Further, defendant Kriegsman served as a member of the Special Committee. Finally, defendant Kriegsman serves as CEO of CytRx, which has engaged in business with both the DreamTeam and TroyGould.  Upon information and belief, defendant Kriegsman is a citizen of California.

34.    Defendant Rudolph Nisi ("Nisi") has served as a director of the Company since 2009.  In addition, defendant Nisi served as a member of the Audit Committee, a member of the Compensation Committee, and Chair of the Governance Committee during the Relevant Period. Upon information and belief, defendant Nisi is a citizen of New York.

35.    Defendant Ashton has served as a director of the Company since 2013.  Further, defendant Ashton served as a member of the Special Committee.  In addition, Defendants have admitted that defendant Ashton is not independent.  Upon information and belief, defendant Ashton is a citizen of Pennsylvania.

36.    Collectively, defendants Ahn, Dunlap, Schwartz, Hillsberg, Chin, Galliker,

Kriegsman, Nisi and Ashton shall be referred to herein as "Defendants."

37.    Collectively, defendants Chin, Galliker and Nisi shall be referred to as the "Audit Committee Defendants."

38.    Collectively, defendants Chin, Galliker and Nisi shall be referred to as the "Governance Committee Defendants."

39.    Collectively, defendants Chin, Kriegsman and Nisi shall be referred to as the "Compensation Committee Defendants."

40.    Collectively, defendants Ahn, Schwartz, Hillsberg, Chin, Galliker, Kriegsman and Nisi shall be referred to as the "Insider Selling Defendants."

### DEFENDANTS' DUTIES

41.    By reason of their positions as officers, directors, and/or fiduciaries of Galena and because of their ability to control the business and corporate affairs of Galena, Defendants owed Galena and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Galena in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Galena and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Galena and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.    Defendants, because of their positions of control and authority as directors and/or officers of Galena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and

directorial positions with Galena, each of the Defendants had knowledge of material non-public information regarding the Company.

43.     To discharge their duties, the officers and directors of Galena were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Galena were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and
>
> c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

44.     The Defendants were required to comply with the Company's Corporate Code of Ethics and Conduct (as amended in January 2012) (the "Code"), which applies to "[e]ach … Company employee, officer and director, as well as agents and contractors working on behalf of the Company."  The Code specifically deals with the Company's insider trading policies.  The Code sets forth, in relevant part:

### 3.    <u>Stocks</u>

Because our stock is a publicly traded security, certain activities of the Company are subject to certain provisions of the federal securities laws. These laws govern the dissemination or use of information about the affairs of the Company or its subsidiaries or affiliates, and other information, which might be of interest to persons considering the purchase or sale of our stock. Violations of the federal securities laws could subject you and the Company to stiff criminal and civil penalties.  Accordingly, the Company does not sanction and will not tolerate any conduct that risks a violation of these laws.

    a.      **Disclosure of Transactions in Company's Securities**

The Securities and Exchange Commission ("SEC") requires continuing disclosure of transactions in the Company's publicly traded securities by the Company, its directors, officers, major shareholders and other affiliated persons. We are committed to complying with obligations related this disclosure.

    b.      **Insider Trading**

It is illegal for any person, either personally or on behalf of others, (i) to buy or sell securities while in possession of material nonpublic information, or (ii) to communicate (to "tip") material nonpublic information to another person who trades in the securities on the basis of the information or who in turn passes the information on to someone who trades. All directors, officers, employees and temporary insiders, such as accountants and lawyers, must comply with these "insider trading" restrictions.

45. Pursuant to the Governance Committee's Charter, the members of the Governance Committee are required to (among other things), review the Company's corporate governance principles and, if necessary or otherwise appropriate, recommend modifications to such principles for Board approval, and review and if necessary or otherwise appropriate, recommend to the Board modifications to the Company's insider trading policy and the Company's code of business conduct and ethics.

46. Pursuant to the Audit Committee's Charter, the members of the Audit Committee are charged with oversight of the Company's legal compliance, including the Company's system of internal control over financial reporting and policies relating to risk assessment and management. In particular, pursuant to the Audit Committee's Charter, the members of the Audit Committee are responsible for:

    a. Reviewing and discussing with management and the internal auditors and the independent auditor of the Company's system of internal control over

financial reporting, its financial and critical accounting practices, and policies

that relate to risk assessment and management;

b.    Reviewing the Company's annual and quarterly financial statements prior to

the filing of the Company's Annual Report on Form 10-K and Quarterly

Reports on Form 10-Q; and

c.    Receiving from the CEO and CFO a report of all significant deficiencies and

material weaknesses in the design or operation of internal control over

financial reporting and any fraud that involves management or other

employees who have a significant role in the Company's internal controls.

47.    Pursuant to the Compensation Committee's Charter, the members of the

Compensation Committee are charged with granting stock options, shares of restricted stock and

other equity-based awards under the Company's incentive compensation plans and other equity-

based plans, including awards to the Company's CEO and other executive officers, and

determining the terms of such stock options, shares of restricted stock and other equity-based

awards.

## SUBSTANTIVE ALLEGATIONS

A.    <u>**Company Background**</u>

48.    According to its public filings, the Company is a biopharmaceutical company

developing and commercializing innovative, targeted oncology treatments that address major

unmet medical needs to advance cancer care.  The Company is developing a pipeline of

immunotherapy product candidates for the treatment of various cancers based on the E75

peptide.  The Company's lead product candidate has always been NeuVax, a vaccine for

preventing or delaying breast cancer recurrence after standard of care treatment, which is in

Phase 3 clinical trials.

49.     Galena traces its roots to 1995, and a company called Apthera.  Apthera was a small biotech company with one peptide-based immunotherapy product in clinical trials, which was to treat low-to-intermediate HER2+ breast cancer patients.

50.     In 2011, RXi Pharmaceuticals ("RXi") acquired Apthera in a stock deal of 4.8 million shares of RXi's common stock, with additional payments based on development and commercial milestones relating to NeuVax.  Subsequently, and as a result of RXi's decision to split into two publicly-traded companies, Galena was formed.  RXi was to remain targeted on RNAi-Based Therapeutics, while Galena was spun off as a company focused on targeting cancer therapies through its one product, NeuVax, and a limited scope of RNAi activities.

51.     It appears as though little to no value was placed on Galena, as Defendants used the spin-off to erase a disappointing balance sheet and history.  To offset the loss of RXi, Galena shareholders received an aggregate of 100 million shares of RXi in connection with the spin-off transaction.  These shares represented approximately 11% of the fully diluted share count, which resulted in Galena being worth about $15 million.  In April 2012, Galena had its initial public offering ("IPO").

52.     Defendants have admitted that NeuVax is the Company's lead product.  By 2013, however, analysts were beginning to seriously question the financial success of this product.  Defendants knew the meaning of this – if NeuVax was lackluster, so was Galena.  And this fact would be reflected in Galena's share price.

53.     By this time, many analysts were coming to the realization that Galena was a small company with few assets, including a lead drug candidate with no guarantee of financial success.  Thus, Defendants decided to take their financial future into their own hands, at the

expense of the Company and its shareholders.

### B.    Defendants' Illicit "Pump and Dump" Scheme

54.    In July 2013, Defendants hired a subsidiary of stock promotion firm the DreamTeam to begin a misleading campaign designed to boost the Company's stock price.  The plan (which was not disclosed to Galena's stockholders) was simple: the DreamTeam would post and publish misleading articles and comments on various investor websites, touting the supposed strength of Galena and its products.  When the Company's share price was high enough, Defendants would unload massive amounts of their personally held stock, and would continue to do so for as long as the ruse continued to work (which is to say, for as long as the share price was artificially elevated).

55.    From then on, as a result of Defendants' agreement with DreamTeam, DreamTeam published a variety of articles on third party websites (such as *Seeking Alpha*), under multiple aliases, to promote Galena's stock.  At no time did these "articles" disclose that Galena had paid for the promotion.  By way of example only, a November 22, 2013 article appeared on *Seeking Alpha*, purportedly written by "Kingmaker," and entitled "Galena Biopharma Continues to Develop a Deep Pipeline of Products."  This article never disclosed the financial relationship with DreamTeam or Galena.

56.    After it was revealed that several of these "articles" were written by the same person (using multiple aliases), the articles were removed from the site without the disclosure of the paid marketing relationship to Galena.

57.    Overall, there were twenty-six articles about Galena published on *Seeking Alpha* between July 2013 and February 2014, the time period in which DreamTeam was providing paid stock promotional services for Galena.

58.    In September 2013, shortly after the publication of an August 6, 2013 DreamTeam "article" on *Seeking Alpha* entitled "Galena Biopharma Presents an Attractive Investment Opportunity," Defendants caused the Company to conduct a $37.5 million public offering of its common stock and warrants.  In connection with the public offering, Galena entered into an Underwriting Agreement filed with the SEC on September 13, 2013.  The Underwriting Agreement, signed by defendant Ahn, stated in no uncertain terms:

> The Company has not taken, nor will it take, directly or indirectly, any action designed to or which might reasonably be expected to cause or result in, or which has constituted or which might reasonably be expected to constitute, the stabilization or manipulation of the price of the Common Stock or any security of the Company to facilitate the sale or resale of any of the Securities.

59.    On November 6, 2013, Defendants issued a press release entitled "Galena Biopharma Reports Third Quarter 2013 Results."  The press release set forth, in relevant part:

> Galena Biopharma (Nasdaq:GALE), a biopharmaceutical company commercializing and developing innovative, targeted oncology treatments that address major unmet medical needs to advance cancer care, today reported its financial results for the three and nine months ended September 30, 2013 and provided a business update.

> "Our commercial success to date with Abstral® has been very encouraging and we are excited to report initial revenues ahead of schedule. With our sales force and commercial organization fully deployed, we continue to make significant strides with physicians, payors and patients—and expect continuing strength with the launch," said Mark J. Ahn, Ph.D., President and Chief Executive Officer. "We are also making steady progress in advancing our NeuVax™ and FBP cancer immunotherapy pipeline."

> **Third Quarter 2013 Financial Highlights**

> Net revenue was $1.2 million for the three months ended September 30, 2013, the first quarter of Abstral® (fentanyl) sublingual tablet sales, ahead of our official launch and commencement of promotional efforts in the fourth quarter. Cost of revenue and gross profit for the three months ended September 30, 2013 were $0.3 and $0.9 million, respectively.

> Operating loss for the three months ended September 30, 2013 was $6.9 million, including $0.5 million in stock-based compensation charges, compared with an

operating loss of $5.5 million for the three months ended September 30, 2012, which includes $0.4 million in stock-based compensation charges. For the nine months ended September 30, 2013, operating loss from continuing operations was $21.5 million compared with $15.6 million for the nine months ended September 30, 2012.

*    *    *

Net loss for the three months ended September 30, 2013 was $9.3 million, or $0.11 per basic and diluted share, versus a net loss of $6.3 million, or $0.09 per basic and diluted share, for the three months ended September 30, 2012. Net loss for the nine months ended September 30, 2013 was $28.2 million, or $0.34 per basic and diluted share, versus a net loss (including both continued operations and discontinued operations) of $31.2 million, or $0.52 per basic and diluted share, for the nine months ended September 30, 2012.

60.     That same day, Defendants caused the Company to file with the SEC a quarterly report on Form 10-Q.  The Form 10-Q was signed by defendants Ahn and Dunlap, and reiterated the financial results announced that same day.  In the Form 10-Q, Defendants made no mention whatsoever of the stock promotion agreement with DreamTeam.

61.     In addition, the Form 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Ahn and Dunlap, attesting to the soundness of the Company's internal controls over financial reporting.

### C.     The Illicit November 2013 Stock Option Grants

62.     On November 22, 2013, DreamTeam published an "article" on *Seeking Alpha* entitled "Galena Biopharma Continues to Develop a Deep Pipeline of Products."  Four days later, on November 26, 2013, the Compensation Committee Defendants granted defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton a collective total of 2.25 million stock options, which carried an exercise price of $3.88.  These grants were the only ones ever issued by the Compensation Committee Defendants at that time of year.  The usual practice of the Compensation Committee Defendants was to grant options to the Company's officers and directors in January of a calendar year (as was done in 2011, 2012 and 2013).  The first tranche of the November 2013 option grants vested on February 26, 2014, shortly before the

eight-month DreamTeam promotional campaign was scheduled to end.

### D.    The Massive Insider Selling in January and February 2014

63.    By early January 2014, phase one of Defendants' scheme was complete.  Due to the illicit stock promotion scheme perpetrated by Defendants and DreamTeam, Galena's stock price had risen significantly.  For reference, in October 2013, Galena's stock price traded at between $2 per share and $3 per share.  By January 2014, however, Galena's stock price was trading at artificially inflated prices between $5 and $7 per share.  With phase one of the scheme complete, it was time for the Insider Selling Defendants to pursue phase two: cashing in on their scheme by selling massive amounts of their personally-held Galena stock at artificially inflated prices.  It is clear that these sales were made while the Insider Selling Defendants were in possession of material, adverse, non-public information about the Company.

64.    In a period of *less than one month*, between January 17, 2014 and February 12, 2014 (a period consisting of just eighteen trading days), and while in possession of material, adverse, non-public information, the Insider Selling Defendants sold over *2.9 million shares* of their personally held Galena stock, collectively reaping proceeds of over *$16 million*.

65.    These were direct sales, and upon information and belief, were not executed pursuant to any pre-arranged 10b5-1 trading plan.  Further, upon information and belief, none of the Insider Selling Defendants had engaged in open market sales of Galena stock in the *four years* prior to January 2014, and none have sold any shares subsequent to February 12, 2014 (which is to say, during and subsequent to the unraveling of the scheme).  Indeed, as discussed below, this "pump and dump" scheme would begin to unravel *the very same day* of the final sale executed February 12, 2014.

66.    Also telling is the massive number of shares the Insider Selling Defendants

unloaded during single-day periods.  Upon information and belief, the Insider Selling Defendants had reason to believe that the stock promotion scheme could unravel at any time.  As such, the Insider Selling Defendants unloaded as many shares as they could in one or two day periods.  In fact, during this period of time, the *minimum* number of shares sold during any one day period by an Insider Selling Defendant was defendant Chin's sale of *75,000 shares* on or about January 30, 2014.  Perhaps most egregiously, defendant Ahn sold *796,765 shares during a single day* on or about January 27, 2014.

67.    In particular, defendant Kriegsman made the following illicit insider sales during the Relevant Period:

| Date | Shares | Price | Proceeds ($) |
|------|--------|-------|--------------|
| January 23, 2014 | 150,000 | Sale at $5.92 per share | 888,000 |
| January 22, 2014 | 250,000 | Sale at $6.13 per share | 1,532,500 |
| January 17, 2014 | 200,000 | Sale at $7.00 per share | 1,400,000 |
| **Total** | **600,000** | | **3,820,500** |

68.    Defendant Hillsberg made the following illicit insider sales during the Relevant Period:

| Date | Shares | Price | Proceeds ($) |
|------|--------|-------|--------------|
| January 30, 2014 | 250,000 | Sale at $5.41 per share | 1,352,500 |
| January 17, 2014 | 200,000 | Sale at $6.93 per share | 1,386,000 |
| **Total** | **450,000** | | **2,738,500** |

69.    Defendant Nisi made the following illicit insider sales during the Relevant Period:

| Date | Shares | Price | Proceeds ($) |
|------|--------|-------|--------------|
| January 29, 2014 | 250,000 | Sale at $5.28 per share | 1,320,000 |
| January 17, 2014 | 200,000 | Sale at $6.90 per share | 1,380,000 |
| **Total** | **450,000** | | **2,700,000** |

70.    Defendant Chin made the following illicit insider sales during the Relevant

Period:

| Date | Shares | Price | Proceeds ($) |
|---|---|---|---|
| February 12, 2014 | 187,500 | Sale at $4.33 per share | 811,875 |
| January 30, 2014 | 75,000 | Sale at $5.57-$5.61 per share | 419,000 |
| **Total** | **262,500** | | **1,230,875** |

71.    Defendant Galliker made the following illicit insider sale during the Relevant

Period:

| Date | Shares | Price | Proceeds ($) |
|---|---|---|---|
| February 3, 2014 | 300,000 | Sale at $4.18 per share | 1,254,000 |

72.    Defendant Schwartz made the following illicit insider sale during the Relevant

Period:

| Date | Shares | Price | Proceeds ($) |
|---|---|---|---|
| January 30, 2014 | 100,000 | Sale at $5.57 per share | 557,000 |

73.    Finally, defendant Ahn made the following illicit insider sale during the Relevant

Period:

| Date | Shares | Price | Proceeds ($) |
|---|---|---|---|
| January 27, 2014 | 796,765 | Sale at $4.83 per share | 3,848,374 |

74.    Not only were a massive number of shares sold in a brief period by the Insider

Selling Defendants, but the sales were inconsistent with those Defendants' previous trading

patterns.  For example, defendant Ahn's sale of 796,765 shares on January 27, 2014 was his ***only***

sale since December 2012.  The same can be said for the other Insider Selling Defendants, whose

only sales during the previous two years were during the time the stock price was artificially

inflated by DreamTeam.  In fact, many of the Insider Selling Defendants made multiple sales

during this brief time period.  Defendants Hillsberg, Chin and Nisi made two sales each, while defendant Kriegsman sold three times.  The Insider Selling Defendants clearly understood the effect of the DreamTeam's promotional campaign, and took take full advantage of the temporary and artificial rise in the stock price.

      **E.**      **The Truth Begins to Emerge**

75.     By late January 2014, Defendants' scheme still remained a secret.  However, analysts were beginning to question the financial success of NeuVax.  For example, a January 31, 2014 *Seeking Alpha* article entitled "Galena Biopharma: Numerous Red Flags Suggest A Significant Overvaluation" suggested that NeuVax might never generate significant revenue for Galena and that the NeuVax Prevention of Recurrence in Early-Stage, Node-Positive Breast Cancer with Low to Intermediate HER2 Expression with NeuVax Treatment ("PRESENT") Phase II Trial was poised for failure since there was little to no evidence to suggest that NeuVax would demonstrate a 30% disease-free progression differential in a large, randomized trial.

76.     On February 12, 2014, however, Defendants' scheme finally came to light.  On that day, *The Street* published an article entitled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions."  The article was authored by Feuerstein, who revealed, in relevant part:

> ***Two articles touting*** *Galena Biopharma* (***GALE***) ***were removed from*** **Seeking Alpha** *Monday because they were written by the same person using different aliases.*
>
> ***This is the second time*** **Seeking Alpha** ***has been forced to take action against individuals using multiple aliases to tout Galena, a small drug developer with a breast cancer vaccine in a phase III study.*** In January 2013, the investor Web site removed five articles promoting Galena written by the same individual under three different pseudonyms.
>
> ***The most recent incident is more serious and potentially damaging because of evidence linking Galena to a stock-promotions firm which wrote and published***

*the articles on* **Seeking Alpha**. ***The articles were part of a broader, coordinated "brand awareness campaign" designed to boost Galena's stock price, according to a document obtained by*** **TheStreet**.

Aided by this promotional campaign, Galena shares tripled in value from this summer. Coincidence or not, Galena insiders have made millions of dollars by selling company stock in January.

Galena did not respond to phone calls and emails seeking comment.

***In July 2013, Galena paid $50,000 to a subsidiary of*** *The DreamTeam Group* **for 240 days of "advertising, branding, marketing, investor relations and social media services," according to a disclaimer on The DreamTeam Group's Web site.**

[Update: Following publication of this story, DreamTeam Group removed the Galena compensation disclosure from its web site. Here is the screen shot disclosing Galena's payment to DreamTeam Group.]

- GALE: MissionIR, an affiliate of DreamTeamGroup, received $50,000 from GALE for 240 days of advertising, branding, marketing, investor relations and social media services provided by MissionIR and affiliate DreamTeamGroup Business Brands. Please read entire MissionIR Disclaimer for FULL Compensation Disclosures.

Publicly traded companies routinely pitch their stock to new investors, but ***some of DreamTeam's marketing tactics appear to resemble stock promotion schemes which run afoul of standard investor relations practices.*** Among its other services, DreamTeam Group operates more than two dozen investor Web sites with names like "Home Run Stocks," "Touchdown Stocks," "Quality Stocks," and "Tout Sheet." The Web sites entice investors with stock picks that can "trade for at least a 100% profit."

***All the stock picks touted on these DreamTeam Web sites, including Galena, are paying clients -- a fact omitted from the Web sites unless someone clicks on a small disclaimer link.***

Galena was promoted on many of the DreamTeam stock-touting Web sites to create "market buzz about the company to a new group of investors," according to a DreamTeam document, "Galena Biopharma Case Study: Investor Awareness Campaign" obtained by *TheStreet*.

As part of this campaign, DreamTeam published favorable articles about Galena on *Seeking Alpha* on Aug. 7, 2013 and Nov. 22, 2013, according to the case-study document. But the articles were written under aliases and make no mention of DreamTeam or its paid marketing relationship with Galena. Instead, they're written from the perspective of individual investors recommending an investment in Galena to other readers of *Seeking Alpha*.

PAGE 23 - VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT

"... investors must look for biopharmaceutical companies that have a unique approach to science, a deep pipeline, drugs with huge market potential, and a healthy fundamental picture. Galena has all of these attributes and shareholders with patience will be handsomely rewarded in due time," is how the author "Wonderful Wizard" pitches Galena to *Seeking Alpha* readers in the article, headlined "Galena Biopharma Presents an Attractive Investment Opportunity," [The article was actually published on Aug. 6.]

On Nov. 22, "Kingmaker" published a similar article on *Seeking Alpha* titled, "Galena Biopharma Continues to Develop a Deep Pipeline of Products." Neither article disclosed a financial relationship with DreamTeam Group or Galena.
Both articles were removed from *Seeking Alpha* on Monday because they were written by the same person.

"We pulled the Aug. 6 and Nov. 22 articles. Upon investigation, the contributor was in violation of our Terms of Use because 'Kingmaker' and 'Wonderful Wizard' were the same person but failed to tell us so," said *Seeking Alpha* Vice President of Content and Editor in Chief Eli Hoffman.

*Seeking Alpha* was unable to determine if the author was paid by DreamTeam Group to write the two articles on Galena, added Hoffman. Hoffman would not disclose the real identify of the author publishing under the "Kingmaker" and "Wonderful Wizard" aliases.

The DreamTeam Group promoted Galena's stock in other ways than just publishing *Seeking Alpha* articles.

"By December 20, 2013, DTG has published a total of 50 unique GALE-centered blogs that were distributed throughout the DTG network and a number of investor-oriented community site on the Internet such as StockHouse, StockTwits, Seeking Alpha and Wall Street Cheat Sheet," DreamTeam explains in the document obtained by *TheStreet*.

DreamTeam also employs people who promote the stocks of paying clients on message boards, Facebook and via Twitter, according to the document. DreamTeam Managing Partner Michael Andrew McCarthy did not respond to a message left on his cellphone.

***All that DreamTeam promotion worked wonders for Galena's stock price, which tripled in value from $2 per share in July 2013 to almost $7.50 in the middle of January. DreamTeam's contract for eight months of work with Galena ends this month.***

***Galena CEO Ahn unloaded $2.8 million in company stock in January, according to SEC filings. Director Steven Kriegsman, who's also the CEO of***

*Cytrx (**CYTR**), pocketed $2.1 million from the sale of Galena stock in the same month, according to SEC filings. Other Galena executives and directors have also been selling shares.*

Cytrx is also a DreamTeam Group client, paying $65,000 for a year's worth of stock promotion, according to a disclaimer on DreamTeam Group's Web site. The timing of the Galena insider sales may or may not be related to the end of the promotional work being done by Galena. In a recent published interview, Ahn said he sold part of his Galena holding to "diversify for my family."

(Emphasis added).

77.    On this news, shares of Galena fell by $0.85 per share, or 16%, to close at $4.34 per share on February 12, 2014.

78.    Two days later, on February 14, 2014, *Seeking Alpha* published an article entitled "A Deeper Look At The Galena Biopharma Controversy." This article revealed, in relevant part:

*As I mentioned in my other Galena article, the company's monstrous rise appeared to occur without a catalyst.* In fact, I stated the following at the time:

"The initial NeuVax data is a little over a year and a half away, Abstral won't turn the company cash flow positive for a minimum of 4 more years, and Galena is about to embark on an expensive Phase 2 trial for another clinical candidate."

Put simply, I saw no reason for such a staggering bull run that topped out at a whopping 470% gain over the last 52 weeks. And I fail to see how the recent acquisition of Mills Pharmaceuticals adds anything of value to Galena at the current time.

*Logic thus dictates that this meteoric rise was primarily the result of promotional efforts by DreamTeam, and had little to do with a change in the underlying fundamentals of the company.*

(Emphasis added.)

79.    Defendants undoubtedly read and were aware of these articles exposing their wrongdoing to Galena shareholders and the public, and in particular, the February 12, 2014 article by Feuerstein cited above. As such, on February 14, 2014, Defendants caused the Company to issue a press release wherein Defendants attempted to "set the record straight" in a

direct response to these articles.  The press release, entitled "Galena Biopharma Issues Letter to

Shareholders" and purportedly written by defendant Ahn, Galena's then-President and CEO, set

forth, in relevant part:

> Dear Shareholders:
>
> Due to the recent media attention on Galena Biopharma that we acknowledge is having an impact on investor confidence, ***we felt it necessary, as a service to our shareholders, to publicly respond to the discussions and set the record straight***.
>
> The genesis of this attention is due to a single reporter, Adam Feuerstein from TheStreet.com, who clearly has an agenda when it comes to Galena. This can be evidenced by his numerous, tabloid-like articles on the company that have appeared over the past three years and are sensational but ***largely devoid of true information***. The article this week is just another in the line, which for us have become noise.
>
> Mr. Feuerstein has never requested a meeting with the company to understand the details of our programs or the goals of the company. On the contrary, his requests for information are consistently accusatory and negative. As a result, we do not feel it is worthwhile to engage him or respond to other media outlets that serve to advance his agenda. However, we do recognize that you, our shareholders, deserve a direct response on the matters at hand.
>
> ***The only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged the DreamTeamGroup and that insiders at the company, including me, divested shares in mid January.*** All other accusations in this article - as with his prior reporting on Galena - are specious and conveniently arranged to create controversy.
>
> Over the past year, we have accomplished the following:
>
> - Acquired Abstral® (fentanyl) sublingual tablets, implemented a commercial team, launched the drug in October 2013, and currently have approximately 5% of the branded market after only four months of launch. Abstral is part of a class-wide Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and Mitigation Strategy (REMS) program designed to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines.
> - Initiated our RELIEF Patient Registry trial for Abstral.
> - Continued to progress our pivotal, Phase 3 PRESENT trial for NeuVax™ (nelipepimut-S) and added another commercial partnership with Dr. Reddy's in India.

- Progressed enrollment with our Phase 2b combination trial with NeuVax and Herceptin® (trastuzumab).
- Expanded our Intellectual Property with an issued patent for NeuVax in Europe.
- Advanced our pipeline with the initiation of a Phase 2 trial with GALE-301, and we expect to report the Phase 1 data mid-year.
- Broadened our portfolio into hematology with the acquisition of Mills Pharmaceuticals and anagrelide controlled release, now GALE-401.

These facts about Galena and our progress are indisputable and clearly demonstrate our dedication to the mission of transforming Galena into a leader in providing therapeutics across the entire cancer-care spectrum. My expectation is that 2014 will unlock additional opportunities that will undoubtedly serve to benefit all who are connected to the success of Galena - most importantly those individuals who are unfortunately confronted with the specter of cancer.

Looking ahead, I would hope that all investors, stakeholders and the media judge Galena on our ability to meet our publicly stated goals. Let success or failure be dictated by facts and data, not the questionable logic of a headline-seeking reporter.

(Emphasis added).

80.     Thus, Defendants *admitted* to hiring DreamTeam to bolster the Company's stock price and *admitted* to divesting massive numbers of Galena shares while the Company's stock price was inflated.  On this news, Galena shares declined by $0.63 per share, or over 14%, to close at $3.73 per share on February 14, 2014.

81.     Notwithstanding that the Company's February 14, 2014 press release purportedly "set the record straight" for public purposes, behind closed doors, on February 17, 2014, the Board voted to create a so-called "Special Committee," which consisted of four directors, to investigate the potential wrongdoing.  The Board would not disclose that it had done so until later.  Upon information and belief, the Special Committee was initially comprised of defendants Ashton, Galliker, Hillsberg, and Kriegsman.  The following month, non-defendant Einhorn joined the Board and became the fifth member of the Special Committee.

82.     On August 11, 2014, the Board announced that the Special Committee's

investigation was complete and that on July 21, 2014, it had appointed defendant Einhorn to serve as a one-member SLC.  Einhorn was specifically charged with making "any and all determinations with respect to [this Complaint] and take all actions he deems necessary or appropriate regarding the claims made in [this Complaint]."

83.     Importantly, the members of the Special Committee lacked the necessary requirements of independence and the ability to conduct a reasonable investigation.  As an initial matter, three of the five Special Committee (Galliker, Hillsberg, and Kriegsman ) members were amongst the top Company insiders who personally sold Galena shares during the eighteen trading day period leading up to *The Street*'s February 12, 2014 scathing report.  Additionally, one of the members, defendant Kriegsman, hired DreamTeam for "promotional services" for CytRx, of which defendant Kriegsman is the CEO and a director.  Defendant Kriegsman and CytRx are now being sued for securities fraud in connection with DreamTeam's touting campaign for that company.  *See*, *Chen v. CytRx, et al.* CV14-1956-GHK (C.D. Cal.).  Further, another Special Committee member, defendant Galliker, serves as CFO of a company called Kindred Bio, which also contracted with DreamTeam for promotional services.  Additionally, Defendants have admitted that defendant Ashton is not independent.  Finally, Special Committee member and Chairman of the Board, defendant Hillsberg, is particularly conflicted since he is managing partner of the law firm that is counsel to Galena, and also to DreamTeam clients CytRx and Kindred Bio, ***the officers of which sit, alongside Hillsberg, on the so-called Special Committee***.  Significantly, Defendants have disclosed that in 2012 and 2013, the Company paid TroyGould $534,932 and $701,126 in legal fees, respectively.[4] Put simply, the "Special Committee" was, from the very outset, fundamentally flawed and its investigation and findings

---

[4] Upon information and belief, CytRx and Kindred Bio likewise paid substantial attorneys' fees in connection with services rendered by TroyGould.

are subject to doubt.

84.     It is clear that the formation of the Special Committee and any investigation conducted by it was a complete sham, the sole purpose of which was to cover up the Defendants' breaches of fiduciary duty and other wrongdoing.  This is exemplified by the fact that a majority of the members appointed to the Special Committee are the very defendants who are accused of engaging in the wrongdoing that the Special Committee is supposedly to be independently and reasonably investigating.  In addition, two members of the Special Committee are directors that the Board has admitted are not independent.  Indeed, the fact that the Board apparently determined that the Special Committee could not make its own determination with regard to the Complaint but had to nominate Einhorn as the sole member of the SLC demonstrates that the Special Committee was not independent and disinterested and any investigation by it was a complete sham.

85.     Significantly, numerous media outlets found that Defendants' February 14, 2014 letter to shareholders left many questions unanswered.  For instance, a February 18, 2014 article entitled "Galena CEO's Response to Stock Promotions Leaves Questions Unanswered" published by *The Street* (written by Feuerstein, the same author that wrote the incriminating February 12, 2014 article) stated:

> NEW YORK (TheStreet) -- Galena Biopharma (GALE_) declined to answer questions about itsstock promotion practices but did admit hiring the marketing firm The DreamTeam Group, which published articles under aliases touting the company's stock without disclosing who paid for them.
>
> In a letter to shareholders released Friday, Galena CEO Mark Ahn accused me of having an "agenda when it comes to Galena" and said my reporting on the company was "tabloid-like" and "largely devoid of true information."
>
> Ahn was responding to a story published Wednesday describing a Galena-funded campaign which used a marketing firm, The DreamTeam Group, to publish

promotional information, including "analyst-like" articles, on Web sites, message boards and social media aimed at boosting the company's stock.

According to a document obtained by TheStreet, the DreamTeam Group published two articles onSeeking Alpha made to look as if they were written by individual investors recommending Galena as an investment. In fact, both articles were written by the same person under two different pseudonyms. Neither articles disclosed a financial relationship with The DreamTeam Group or Galena. Seeking Alpha removed both articles from its Web site last week.

"The only facts in Mr. Feuerstein's most recent article that are remotely accurate are that Galena previously engaged The DreamTeamGroup and that insiders at the company, including me, divested shares in mid January. All other accusations in this article -- as with his prior reporting on Galena -- are specious and conveniently arranged to create controversy," said Ahn, in his letter to shareholders.

But aside from labeling the story superficially plausible but wrong, Ahn's letter provided no factual evidence to support his or Galena's position.

Ahn also spoke to a reporter for *The Oregonian* who wrote a story on the Galena situation Friday night:

> "Ahn, Galena's CEO, said the company did not intend to mislead investors. He [Ahn] did not know the DreamTeam Group was not disclosing that its promotional materials were funded by Galena. In fact, he said he'd been told DreamTeam didn't write the Seeking Alpha articles. It was 'an independent writer,' he said."

Ahn's defense contradicts the DreamTeam document which says the firm published the two Seeking Alpha articles on Aug. 7, 2013 and Nov. 22, 2013. The document also describes a third pro-Galena article published on Wall Street Cheat Sheet on Dec. 5, 2013.

There were 26 articles about Galena published on Seeking Alpha between July 2013 and last Wednesday -- the time period in which DreamTeam Group was providing paid stock promotional services to the company. Why did the DreamTeam document only highlight the two Seeking Alpha articles published on Aug. 7 and Nov. 22 -- and ignore all the others -- if the firm didn't write them? Whether Ahn knew or not about the source of the two articles, The DreamTeam Group knew and did not disclose pertinent information to investors.

TheStreet has uncovered a second DreamTeam document which further explains how the firm hires writers to publish articles on Seeking Alpha and other investor Web sites to promote the stocks of its paying clients.

PAGE 30 - VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

This second DreamTeam document states:

> "Although blogs are widely read and a key part of our social media relations strategy, they take a more informal approach and don't offer the deeper analysis our articles offer. Articles are directed toward sophisticated investors who understand complex evaluation of investments, and *we publish our articles* where these investors commonly go to seek new investment ideas - ensuring that the highest quality content about YOUR company gets seen by the right people. *We use our own writers to generate content*, and we utilize our network for distribution. We reach a vast audience through our partners and media contacts, and for those who do their own research, it certainly helps to have positive information coming from multiple sources.
>
> *Seeking Alpha, which boasts more than 1 million members, is the No. 1 outlet we use to circulate this kind of detailed information for our clients*. Recognized as the premier Web site for actionable stock market opinion and analysis, Seeking Alpha handpicks articles from the world's top market blogs, money managers, financial experts and investment newsletters - publishing approximately 250 articles each day. Seeking Alpha was named 'Most Informative Web Site' by Kiplinger's Magazine and has also received Forbes' 'Best of the Web' award.
>
> *Utilizing this outlet, we've received more than 6,500 views for a single article, and our articles are also featured on many prominent sites, including Yahoo! Finance*. We not only craft superior content - we maximize its effectiveness on your behalf."

[Bolded emphasis in published article].

Another question left unanswered in Galena's response to Wednesday's story: *If there was nothing improper about the promotional material disseminated by The DreamTeam Group on Galena's behalf, why has The DreamTeam Group tried to erase all of it from the Internet?*

References to Galena have been expunged from the DreamTeam Group's galaxy of Web sites, blogs and Twitter feeds since the publication of my story Wednesday. The compensation disclosure noting the $50,000 payment made by Galena to The DreamTeam Group was also deleted. Cached copies of The DreamTeam Group's promotional work for Galena can still be found on Internet archive sites.

*As for the recent stock selling by Galena executives and directors, Ahn told The Oregonian that insiders were prohibited from selling stock until very recently because the company was in negotiations to acquire Mills Pharmaceuticals.*

*But when asked about insider selling in a different interview on Feb. 4, Ahn said he sold stock to "diversify for my family," and made no mention of insider sale restrictions, leaving yet another unanswered question.*

(Emphasis added).

86.    On March 13, 2014, *Seeking Alpha* published an article entitled "Behind the Scenes with Dream Team, CytRx and Galena." This article was written by an author, Richard Pearson, who had been personally approached by DreamTeam to write favorable articles about Galena, and in response, "played along" for a time, in order to expose the illicit stock promotion scheme. Mr. Pearson's article provided specific details regarding Defendants' scheme with the DreamTeam. Specifically, Mr. Pearson's article stated, in pertinent part:

A few weeks ago I received a surprising email asking me to be a paid stock tout for IR firm "The Dream Team Group." I was asked to write paid promotional articles on Galena Biopharma (NASDAQ:GALE) and CytRx Corp (NASDAQ:CYTR), without disclosing payment. ***Rather than refuse outright, I decided to investigate.*** I began submitting dummy articles to the Dream Team rep (with no intention of ever publishing them). My goal was to determine how involved management from these two companies were in this undisclosed paid promotion scheme. Below I will provide detailed documentation (emails and attachments) that indicate management from both Galena and CytRx were intimately involved in <u>reviewing and editing the paid articles on their own stock</u> at precisely the time they were looking to sell / issue shares.

***Management will have a very difficult time convincing investors that "we didn't know."*** The articles were provided from Dream Team directly to CytRx and Galena. Management then edited and approved the articles and would have seen the lack of disclosure. When they appeared in final publication there was again no disclosure. And ***it seems no coincidence that there appears to have been great urgency to get these articles in almost exact proximity to sales / issuances of stock by insiders and the companies at both Galena and CytRx***.

Many investors are aware that Galena was previously a subsidiary of CytRx and that the CEO of CytRx also sits on the board of Galena.

***The promotional articles and the paid retention of the Dream Team Group were <u>coordinated with the release of news </u>and data from the companies such***

***that they coincided with the share prices of both stocks rising dramatically***. News events included items like the completion of Phase 2 trials, the inception of new trials and the receipt of an SPA from the FDA. Clearly these would all normally be expected to have a positive effect on their own. Yet management used coordinated articles in the media to interpret and amplify the effect of the news which it had released.

The promotional campaigns by Dream Team extended to various web sites including Forbes, TheStreet.com, Motley Fool, Wall Street Cheat Sheet and Seeking Alpha. Multiple aliases were used, some of which pretended to be hedge fund managers. At least 13 articles on CytRx alone have now been removed, most of those during the past two days alone.

The undisclosed media promotions coordinated with the release of news and data saw both of these stocks rise from around $2.00 in November to around $8.00 by January. The fact that these recent news releases were concurrent with undisclosed stock promotions casts significant doubt on many of the fundamental statements made by these companies regarding their drug prospects.

Below I include a review of Federal Securities Laws Section 17b (regarding touting) and Section 10b(5) (the anti-fraud provision). Given that the recent equity offering from CytRx occurred on the back of this undisclosed promotion, it creates the potential that the proceeds from the offering may be at significant legal risk. Investors who bought into the offering at $6.50 are already well underwater. They may find these promotions to have been very disturbing in the context of their flagging investment.

<u>Broader awareness of these issues could see the share prices of both CytRx and Galena trade to well below $2.00, back where they were when the promotions began.</u>

*   *   *

*Background*

A few weeks ago I received an email and subsequent phone calls asking me to be a paid stock tout for an IR firm called The Dream Team Group ("DTG"). The sender first informed me about an article he wanted on CytRx Corp., and later asked for additional articles on Galena Biopharma, among others.

This was a notably odd invitation for me to receive given that I generally write very negative articles focused on inappropriate (and sometimes what I view as illegal) behavior by US-listed companies and their promoters. It was clear that the individual contacting me had not even bothered to read what I have written in the past. He clearly had no idea what he had just stumbled into by contacting me of all people.

The individual ultimately revealed his name to be Tom Meyer. He later informed me that the IR firm he works for was the Dream Team and that he worked closely with the head of Dream Team, Michael McCarthy. In his initial emails and in subsequent phone discussions, I was offered $300 per article, but was also told that there were two conditions. First, management of the companies would have to sign off (and edit) the articles. Second, I would not be allowed to disclose that I was getting paid.

Hi Rick,

Thanks for getting back to me so soon. I work for an IR firm and I have a team that I manage. So when the firm has a new client, they will ask me to start getting some articles published on various sites. And then my team will get started on it. We typically cover biotech companies but occasionally will have some others as well.

When I give you an assignment, you will type up the draft and then send back to me so I can get the company's approval. I will send you back the edited version and then you can publish. Once published, I will pay you $300. We send checks to our guys every 2 weeks.

Let me know if that is of interest to you.

Thanks a lot,

Tom

I was told to not worry about posting on Yahoo message boards, because DTG has a full team which handles the posting of numerous bullish messages on places like Yahoo Finance.

I felt that there was a lot of information to be uncovered if I dug deeper. So rather than immediately make my findings public, I chose to fly to Chicago to meet Mr. Meyer in person and then submit a series of "dummy articles" to him to see what response I could get. (At minus 20 degrees, Chicago was actually 100 degrees colder than Los Angeles during my visit!)

My goal in submitting dummy articles to DTG was to determine the level of involvement of management of these companies in reviewing and editing articles. To me, this was of far greater significance than the (already troubling) non-disclosure by various authors and IR firms who might be getting paid. As a result, I submitted dummy articles to Tom / Dream Team on both CytRx and Galena as well as a few others.

\*    \*    \*

***With Galena, I was told that the company suddenly changed its mind and cancelled the article on February 10th, almost immediately prior to an exposé***

PAGE 34 - VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT

*article by Adam Feuerstein at TheStreet*. Based on this, I am under the assumption that Galena backed out from wanting an article from me as a result of Mr. Feuerstein calling them just before publishing his article. In any event, the offer of payment still stood from Tom/DTG as compensation for my time.

\*   \*   \*

On February 6th, I asked Mr. Meyer the following:

> "on GALE, I thought that John Mylant did a great piece this week, but he did not address the short attack. did the company approve his piece?"

To which Mr. Meyer responded:

> "John wrote his article before the short piece came out. It was published after but written before. ***The company just took a long time to approve it. Wouldn't have been fair to make him go back and add something else.***
>
> ***He's been working for me 4 months or so.*** He's pretty good, gets things written pretty quick.
>
> ***GALE is just slow my friend. I chatted with Michael last night*** and they're still pending. I can't make them approve when I say, it's up to them unfortunately."

[Underlined emphasis in original article].

87.   On March 17, 2014, Defendants caused Galena to file with the SEC its annual report on Form 10-K.  Therein, Defendants revealed that in February 2014, they learned that the SEC was investigating "certain matters relating to our company and an outside investor-relations firm that we retained in 2013."  The Form 10-K disclosed the following:

> In February 2014, we learned that **the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013.** We have been in contact with the SEC staff through our counsel and are cooperating with the investigation.
>
> \*   \*   \*
>
> On March 14, 2014, the company's board of directors appointed Irving M. Einhorn agreed to serve as a Class II director of the company, with a term expiring at the 2015 annual stockholder meeting, and as a member of the special committee of the board of directors formed to investigate certain allegations contained in the purported derivative complaint recently filed against the company and certain of its directors. Mr. Einhorn will be compensated for his

services as director and member of the special committee in the same manner as other directors and special committee members.

88.   In commenting on the SEC investigation, *The Motley Fool*, in an article entitled "Galena Biopharma Earnings Report: 'P.S. – We're Under Investigation'" dated March 20, 2014 stated, in pertinent part:

It pays to read the fine print.

Galena Biopharma (NASDAQ: GALE ) reported its fourth-quarter results after the market closed on Monday. There were plenty of financial numbers to digest, of course, and a few interesting updates on the company's products and leadership team. ***The biggest news, though, didn't make the earnings announcement press release at all and wasn't mentioned until the bottom of page 37 of Galena's 10-K filing to the SEC***.

***What was that big news? Galena revealed that it learned in February that the SEC is investigating "certain matters related to our company and an outside investor-relations firm that we retained in 2013***." The biotech stated that it has been in contact with the SEC and is cooperating with the investigation. Galena's shares dropped more than 9% in after-hours trading on Monday.

Postscript from posts

The two sentences in the 10-K seem sort of like a postscript in a letter: "P.S. --By the way, we're under investigation." The federal investigation postscript appears to be related to several online posts made earlier this year.

On Feb. 12, The Street's Adam Feuerstein reported that The DreamTeam Group, a stock-promotions firm, published multiple online articles touting Galena under pseudonyms that made the articles appear to have been written by individual investors. He also noted that insiders with the biotech made millions of dollars in January by selling shares after the stock tripled in value with assistance from the promotions. Galena's stock nosedived on the revelations.

Galena responded a couple of days later in a letter to its shareholders. CEO Mark Ahn stated that Feuerstein "clearly has an agenda when it comes to Galena." Ahn acknowledged that the biotech had previously engaged The DreamTeam Group and that insiders had sold shares in January. However, he said Feuerstein's accusations were "specious and conveniently arranged to create controversy."

This story continued last week when an investor, Richard Pearson, wrote in an article published on the website Seeking Alpha that The DreamTeam Group offered to pay him to promote Galena and CytRx

Corporation (NASDAQ: CYTR ).  Seeking Alpha pulled several articles from its website following Pearson's allegations. Several other online financial websites, including The Motley Fool, have also removed articles related to this controversy.

Signal or noise?

In that letter to shareholders, Ahn dismissed negative articles as "noise" to his company. The question for investors is whether he's right or if the SEC investigation is really more signal than noise.

(Emphasis added).

89.    On August 11, 2014, Defendants caused the Company to file its quarterly report on Form 10-Q for the second quarter of 2014.  Therein, Defendants confirmed that the SEC's investigation remained ongoing.  Additionally, Defendants stated that the previously-formed Special Committee had completed its investigation, but notably failed to disclose any details of the Special Committee's conclusions or what actions, if any, had been taken based on the Special Committee's conclusions.

90.    Moreover, in that same filing it was revealed that "on July 21, 2014, our board appointed Irving M. Einhorn as a special litigation committee in order to make any and all determinations with respect to the complaints and take all actions he deems necessary or appropriate regarding the claims made in the complaints."

91.    This was a stunning turn of events, particularly given that Einhorn was a member of the tainted Special Committee, had already personally participated in a so-called investigation into the alleged wrongdoing alongside interested and non-independent Special Committee members (as explained above), and undoubtedly had already reached a conclusion with respect to the Plaintiffs' claims.

92.    Einhorn's appointment as an SLC, however, was all part of the Defendants' scheme to escape liability.  On September 25, 2014, Galena issued a press release announcing

the public release of the report created pursuant to the Special Committee's purported investigation (the "Report" or "Special Committee Report").  The Special Committee Report included various evidentiary "findings," including: (a) that defendant Ahn knew about the DreamTeam's activities before he traded Galena stock; (b) that another so-called "investor relations firm," Lidingo Holdings LLC ("Lidingo"),[5] also "paid bloggers to write promotional articles about Galena and that the Company was aware of this fact";  (c) that Lidingo intended to raise Galena's stock price through its efforts;  (d) that Ahn granted Lidingo 250,000 Galena stock options in August 2013 as compensation without Board approval, in violation of Galena's policies;  and (e) that Ahn knew about Lidingo's activities before he traded Galena stock.

93.    Even in the face of these "findings," to the surprise of nobody at all in light of the Special Committee's fundamentally flawed composition and "investigation," the Report stated that the Special Committee, of which Einhorn was a "key member," had concluded that "there is no credible basis for finding that the Company or insiders violated applicable law as alleged in the class and derivative actions or that insiders breached their fiduciary duties to the Company under any jurisdictional standard. Moreover, we do not recommend that the Company pursue claims against any person or entity as a result of the findings of this investigation."

94.    Notably, the Special Committee Report is dated July 15, 2014, a mere six days before the Board appointed Einhorn as a single person SLC.  Thus, Einhorn was appointed by the Board to act as the SLC *after* he had already made the determination that the claims asserted in this Complaint should not proceed, and that the Defendants (including those defendants who also

---

[5] According to the Special Committee Report, Lidingo was first retained by Galena in January 2012, and subsequently entered into a second "consulting agreement" in August 2013, directly on the heels of the retention of the DreamTeam in July 2013.  The Report also states that "it is possible" that Lidingo violated Section 17(b) of the Securities Act of 1933, and further acknowledges that Galena may have "limited" exposure to liability under Section 17(b).

served on the "Special Committee" and Defendant Ahn) should be exonerated.  In sum, Einhorn is clearly unsuitable to serve as a member of any SLC, let alone a single person SLC.[6]

95.     Finally, on August 21, 2014, *The Street* reported, based on the account of "a source close to the company," that defendant Ahn was "fired" by the Board at a "special meeting" held on August 18, 2014.  Contrary to this media report that Ahn was terminated, however, the Board issued a press release on August 21, 2014 in which the Board claimed that Ahn purportedly "resigned as the President and CEO and as a director of the company to pursue other long held personal and professional goals."  Defendant Schwartz was appointed President and CEO effective immediately replacing Defendant Ahn.

96.     The price of the Company's stock still has not recovered from Defendants' pervasive breaches and it currently trades at around $2 per share.

97.     Accordingly, as a result of Defendants' breaches of fiduciary duty, the Company has sustained damages including, *inter alia,* the amount received by the Insider Selling Defendants as a result of their illicit stock sales, the value of the improper November 13 stock options, and the costs and expenses incurred in connection with the Company's Special Committee and SLC investigations and responding to the SEC's investigation.

98.     Moreover, the Defendants' wrongdoing has directly placed the Company in a precarious financial position, such that the Company is unable to secure funding from institutional investors.  Left no other option, the Company was recently forced to secure funding

---

[6] On October 22, 2014, this Court entered an order denying Galena's motion to stay pending the conclusion of the SLC's investigation  concluding, *inter alia,* that "it is unlikely that any future decision by the SLC to terminate this litigation will withstand scrutiny…because Einhorn has already conducted an investigation, issued a report to the Board as part of the two-person Special Committee, and publicly announced his conclusion that the Galena insiders did not engage in any wrongdoing, Einhorn fails an 'unyielding' evaluation of his independence and objectivity to proceed with the SLC investigation."  (Docket No. 44).

from Lincoln Park Financial ("Lincoln Park") at great cost to the Company.  A November 14, 2014 article entitled "Galena, Shunned by Wall Street, Forced to Seek Pricey Vulture Financing," published by *The Street* and written by Feuerstein, analyzed the unfair terms of Galena's arrangement with Lincoln Park stating in relevant part:

> Lincoln Park's involvement here is interesting in that these are the guys willing to throw a cash lifeline to companies unable to raise money via a traditional stock offering. Galena, according to a source familiar with the company's funding shortfall, was unable to muster sufficient interest from institutional investors. So, Galena has apparently turned to Lincoln Park, which has a reputation for financing troubled biotech companies -- but at great cost.

> Galena tried its best to spin the Lincoln Park arrangement positive, but the onerous deal terms are detailed in the company's regulatory filing with the SEC.

> Under terms of the agreement, Lincoln Park is buying an initial $5 million in Galena stock at $2 per share. Galena, in its press release, claimed the purchase price was 9% above the stock's closing price of $1.84 on Nov. 18. Galena failed to mention publicly that Lincoln Park was given 631,221 free shares of company stock in order to make the financing happen. Add those free shares into the calculations and Lincoln Park's $5 million initial investment in Galena is valued at $1.59 per share, or a 14% discount to the market price at the time the deal was signed.

> Over the next three years, Galena can put blocks of its stock to Lincoln Financial for purchase, up to $50 million. Left unsaid by Galena is that Lincoln Park gets to buy this stock at best price, if not a discount, to the market. According to the deal terms described in the SEC filings, the purchase price of the Galena stock will be the lower of two scenarios: 1) the lowest sale price of the common stock on the date of purchase; or 2) the average of the three lowest closing sale prices for the common stock during the 10 consecutive business days preceding the purchase date.

> What does Lincoln Park do with the Galena stock it buys from the company at a discount? The firm re-sells the stock right back into the market, making a profit on the difference in price. Galena describes Lincoln Park as an "institutional investor," implying the firm is investing in the company as a long-term shareholder. That's not how Lincoln Park operates.

> Galena' press release claims Lincoln Financial is prohibited from shorting the company's stock, but the fine print of the deal disclosed in the SEC filings only says Lincoln Park is restricted from having a "net short" position. That's a subtle difference but important because it allows Lincoln Park to make additional money

off Galena by arbitraging, or selling, shares it expects to receive.

**F.    The Board Enacts an *Ultra Vires* Forum-Selection Clause in a Desperate and Failed Attempt to Minimize or Avoid Liability for Their Misconduct**

99.    Almost immediately after hiring of the DreamTeam, the Board sought to protect themselves from liability for their serious transgressions by attempting to enact the forum-selection clause (the "Clause") in Galena's Bylaws.  Specifically, on August 6, 2013, the Board amended the Bylaws to add the Clause as follows:

<u>New Section 6.15 of the Amended and Restated By-Laws of Galena Biopharma, Inc.</u>

(As amended August 6, 2013)

6.15 Forum For Adjudication Of Disputes. Unless the corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any director, officer, employee or agent of the corporation to the corporation or the corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, the certificate of incorporation or the by-laws of the corporation or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to said Court of Chancery having personal jurisdiction over the indispensable parties named as defendants therein. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the corporation shall be deemed to have notice of and consented to the provisions of this Section.

100.    The Board, however, in its haste to enact the Clause and limit or eliminate liability for their wrongdoing, ignored a bedrock point of Delaware law.  Pursuant to DEL. CODE ANN. Tit. 8, § 109(a), a company's certificate of incorporation must allow a board of directors the power to adopt and amend corporate bylaws unilaterally.  § 109(a) specifically states:

(a)    The original or other bylaws of a corporation may be adopted, amended or repealed by the incorporators, by the initial directors of a corporation other than a nonstock corporation or initial members of the governing body of a

nonstock corporation if they were named in the certificate of incorporation, or, before a corporation other than a nonstock corporation has received any payment for any of its stock, by its board of directors. After a corporation other than a nonstock corporation has received any payment for any of its stock, the power to adopt, amend or repeal bylaws shall be in the stockholders entitled to vote. In the case of a nonstock corporation, the power to adopt, amend or repeal bylaws shall be in its members entitled to vote. ***Notwithstanding the foregoing, any corporation may, in its certificate of incorporation, confer the power to adopt, amend or repeal bylaws upon the directors or, in the case of a nonstock corporation, upon its governing body.*** The fact that such power has been so conferred upon the directors or governing body, as the case may be, shall not divest the stockholders or members of the power, nor limit their power to adopt, amend or repeal bylaws.

(Emphasis added).

101.    Thus, the plain words of § 109(a) make clear that the power of a board to unilaterally amend the corporate bylaws, *i.e.,* without a shareholder vote, has to be given to the board *in the articles of incorporation, not the bylaws*.

102.    Galena's operative Certificate of Incorporation contains ***no*** such provision granting Galena's Board the authority to unilaterally amend its corporate bylaws.  Indeed, the Certificate of Incorporation makes clear that the Board has no authority to unilaterally adopt the Clause stating that the Bylaws cannot be amended without a required shareholder vote of 75% approval.  *See* Exhibit A.  This shareholder vote was ***never*** sought out by the Board in its haste to put the forum selection clause in place.

103.    In sum, the Clause is *ultra vires* and should immediately be rescinded because contrary to § 109(a), there is no provision in Galena's Articles of Incorporation granting the Board the power to unilaterally amend the Bylaws.

104.    Moreover, even though at the time of enactment of the Clause, the Board knew or should have known that the Company's Articles of Incorporation did not allow the Board to adopt the Clause without a shareholder vote, a vote which the Board never sought, Defendants

attempted to enforce the Clause in connection with the various derivative actions filed outside of the Delaware Chancery Court.  For instance, in June 2014, Defendants sought to dismiss this Action based on the *ultra vires* Clause, requesting dismissal from this Court on the basis that Plaintiffs had filed their initial complaint in the wrong forum, *i.e.,* not the Delaware Chancery Court.

105.    In opposing the motion to dismiss, Plaintiffs' Counsel informed counsel for the Defendants, including the Board, in no uncertain terms that the Clause was contrary to § 109(a), rendering the Clause illegal and invalid.  Despite this actual knowledge, the Board, in a continuing breach of their fiduciary duties, has taken no steps to rescind the improper Clause. Moreover, the Board has never disclosed to shareholders that the Clause is invalid, and why it is invalid.

## DERIVATIVE AND DEMAND ALLEGATIONS

106.    Plaintiffs bring this action derivatively in the right and for the benefit of Galena to redress the breaches of fiduciary duty and other violations of law by Defendants.

107.    Plaintiffs will adequately and fairly represent the interests of Galena and its shareholders in enforcing and prosecuting its rights.

108.    At the time this action was initiated, the Board consisted of the following eight (8) directors: defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman, Nisi and Ashton, and non-defendant Einhorn.  Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

a.  On August 11, 2014, the Board announced that the Special Committee's investigation was complete and that on July 21, 2014, it had appointed

defendant Einhorn to serve as a one-member SLC. Einhorn was specifically charged with making "any and all determinations with respect to [this Complaint] and take all actions he deems necessary or appropriate regarding the claims made in [this Complaint]." Under Delaware law, the act of establishing an SLC constitutes an implicit concession by a board that its members are interested and that its decisions are not entitled to the protection of the business judgment rule, and accordingly, that pre-suit demand is excused. Accordingly, the Board has admitted that any demand upon it would have been futile.

b.   Demand is excused because the Board created and empowered a "Special Committee" to investigate wrongdoing and populated the Special Committee with directors that were not disinterested and were not independent. Defendants Ashton, Galliker, Hillsberg and Kriegsman, as members of the so-called Special Committee, participated in a sham Special Committee "investigation," the sole purpose of which was to cover up the Defendants' wrongdoing. The Special Committee itself and any investigation it "performed" was completely illusory given the fact that a majority of the members appointed to the Special Committee are the very defendants who are specifically implicated in the misconduct that the Special Committee was tasked with independently and reasonably investigating. Moreover two members of the Special Committee are directors that the Board admits are not independent. Indeed, the fact that the Special Committee apparently could not make its own determination with regard to the Complaint, but was instead

compelled to nominate Einhorn as the sole member of the SLC demonstrates that the Special Committee was not disinterested and lacked independence. Forming a sham Special Committee for the purpose of covering up wrongdoing is not, and could not possibly be, the result of a good faith exercise of business judgment, and is not protected by the business judgment rule.

c. During the Relevant Period, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi (a majority of the Board) each illicitly sold shares of Galena stock while they were in possession of material, adverse, non-public information, during a time in which Galena stock was artificially inflated due to Defendants' misconduct.  As a result of these illicit insider sales, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi each received direct financial benefits not shared with Galena shareholders, and are, therefore, each directly interested in a demand.  Further, defendants Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  Accordingly, demand upon Ahn, Hillsberg, Chin, Galliker, Kriegsman and Nisi is futile.

d. Defendants Nisi, Ahn, Kriegsman, Hillsberg, Galliker, Chin and Ashton (a majority of the Board) are each directly interested in a demand due to their receipt of illicit stock option awards in November 2013.  These option grants were and are illicit because (among other things) they were deliberately timed

to coincide with certain DreamTeam publications promoting Galena's stock, and the exercise price of the options may have been fixed before DreamTeam's efforts caused further increases in Galena's stock price. Accordingly, defendants Nisi, Ahn, Kriegsman, Hillsberg, Galliker, Chin and Ashton are each directly interested in a demand, rendering any demand upon them is futile.

e.   At the time the action was initiated, the principal professional occupation of defendant Ahn was his employment with Galena as President and CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   In addition, according to the Company's Proxy Statement filed with the SEC on April 29, 2013, Defendants have admitted that defendant Ahn is not independent.   Thus, defendant Ahn lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.   In addition, defendant Ahn faces a substantial likelihood of liability for his illicit insider sales of Galena stock and his illicit receipt of stock option awards, as set forth above.

f.   During the Relevant Period, defendants Chin, Galliker and Nisi served as members of the Governance Committee.   Pursuant to the Company's Governance Committee Charter, the members of the Governance Committee were and are responsible for, *inter alia*, reviewing the Company's corporate governance principles, and reviewing and recommending modifications to the Company's insider trading policies and the Code.  Defendants Chin, Galliker

and Nisi breached their fiduciary duties of due care, loyalty, and good faith, because the Governance Committee, *inter alia*, allowed or permitted the Company to engage DreamTeam to artificially inflate the price of the Company's stock and allowed or permitted the Insider Selling Defendants to sell a massive amount of Galena shares while in possession of material, adverse, non-public information. This was in violation of the Company's insider trading policy and the Code. Therefore, defendants Chin, Galliker and Nisi each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

g. During the Relevant Period, defendants Chin, Galliker and Nisi served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, oversight of the Company's legal compliance program, reviewing the Company's annual and quarterly financial reports and press releases, and reviewing the integrity of the Company's internal controls. Defendants Chin, Galliker and Nisi breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures, as well as causing the above breaches of legal compliance with respect to the illicit insider trading. Therefore, defendants Chin, Galliker and Nisi each face a substantial likelihood of

liability for their breach of fiduciary duties and any demand upon them is futile.

h.  During the Relevant Period, defendants Chin, Kriegsman and Nisi served as members of the Board's Compensation Committee.  The Compensation Committee Defendants face a substantial likelihood of liability in connection with the improper stock option grants awarded in November 2013.  In particular, the Compensation Committee Defendants face a substantial likelihood of liability in connection with timing the stock option grants to coincide with certain DreamTeam publications promoting Galena's stock, and fixing the exercise price of the options before DreamTeam's efforts caused further increases in Galena's stock price.  Therefore, defendants Chin, Kriegsman and Nisi face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

i.  According to Defendants, defendant Ashton is not independent.  Galena's website contains a list of non-employee directors, with an "I" designating a director as independent.  As illustrated below,[7] Defendants have not conferred such a designation on defendant Ashton.  Thus defendants have admitted that defendant Ashton lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.  In addition, defendant Ashton faces a substantial likelihood of liability for his illicit receipt of stock option awards, as set forth above.

---

[7] http://investors.galenabiopharma.com/committees.cfm, as accessed on March 21, 2014.

## Committee Composition

| | Audit | Compensation | Nominating and Governance | Ad Hoc (Strategy, Pricing, etc) |
|---|---|---|---|---|
| William L. Ashton | | | | Member |
| Dr. Richard Chin, M.D. [I] | Member | Member | Member | |
| Stephen S. Galliker [I] | Chair | | Member | |
| Sanford J. Hillsberg ★ | | | | Chair |
| Steven A. Kriegsman [I] | | Chair | | Member |
| Dr. Rudolph Nisi, M.D. [I] | Member | | Member | Member |

★ = Chair of the Board    Ⓖ = Chair    ● = Member    I = Independent Director

j.  According to Defendants, defendant Hillsberg is likewise not independent. Galena's website contains a list of non-employee directors, with an "I" designating a director as independent. As illustrated above, Defendants have not conferred such a designation on defendant Hillsberg. Thus defendants have admitted that defendant Hillsberg lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action. In addition, defendant Hillsberg lacks independence due to his position as a senior partner at the law firm TroyGould. TroyGould served as Galena's outside corporate counsel, and rendered an opinion as to the validity of the securities in the September 2013 public offering. Further, Defendants have disclosed that in 2012 and 2013, the Company paid TroyGould $534,932 and $701,126 in legal fees, respectively. Additionally, TroyGould has served as counsel to CytRx, which defendant Kriegsman serves as the CEO of and Kindred Bio, which defendant Galliker serves as the CFO of. Defendant Hillsberg thus lacks independence due to this intertwined professional relationship. In addition,

defendant Hillsberg faces a substantial likelihood of liability for his illicit insider sales of Galena stock and his illicit receipt of stock option awards, as set forth above.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

109.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

110.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Galena disseminated accurate, truthful and complete information to its shareholders.

111.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Galena shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

112.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST THE INSIDER SELLING DEFENDANTS FOR UNJUST ENRICHMENT BASED ON THEIR INSIDER SELLING

113.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

114.    The Insider Selling Defendants have been unjustly enriched at the expense of Galena, in the form of their illegal stock sales as explained herein.

115.    By their wrongful acts and omissions, the Insider Selling Defendants were unjustly enriched at the expense of and to the detriment of Galena.

116.    Plaintiffs, as a shareholders and representatives of Galena, seek restitution from the Insider Selling Defendants and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Insider Selling Defendants, and each of them, from their wrongful conduct and fiduciary breaches in connection their illegal stock sales.

**COUNT III**
**AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

117.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

118.    At the time of the stock sales set forth herein, the Insider Selling Defendants were in possession of material, adverse, non-public information described above, and sold Galena common stock on the basis of such information.

119.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company that the Insider Selling Defendants used for their own benefit when they sold Galena common stock.

120.    At the time of their stock sales, the Insider Selling Defendants knew that Defendants had hired DreamTeam to artificially inflate the price of the Company's stock, and that DreamTeam had in fact artificially inflated the price of Galena stock.

121.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.  Plaintiffs, on behalf of Galena, have no adequate remedy at law.

## COUNT IV
### AGAINST DEFENDANTS AHN, HILLSBERG, CHIN, GALLIKER, KRIEGSMAN, NISI, AND ASHTON FOR BREACH OF FIDUCIARY DUTY IN CONNECTION WITH THE ENACTMENT AND ATTEMPTED ENFORCEMENT OF THE CLAUSE

122.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

123.    As alleged in detail herein, each of the members of the Board had a duty to, *inter alia,* exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and, when placed on notice of improper actions by the Company and/or its employees, exercise good faith in taking action to correct the improper actions.

124.    The Board knew or should have known that the improper Clause violates DEL. CODE ANN. Tit. 8, § 109(a), as alleged herein, and therefore breached their fiduciary duties of loyalty and good faith by knowingly and improperly attempting to enact and enforce the Clause.

125.    Despite their knowledge that the Clause is improper, the Board has further breached its fiduciary duties by failing to rescind the Clause.

126.    As a result of the Board's breaches of fiduciary duties, Galena has sustained damages, as alleged herein.

## COUNT V
### BREACH OF FIDUCIARY DUTY AND/OR AIDING AND ABETTING AGAINST THE COMPENSATION COMMITTEE DEFENDANTS

127.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.    Each of the Compensation Committee Defendants agreed to and did participate with each other and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties they owed to the Company in connection with their illicit grant of options in November 2013.

129.    The Compensation Committee Defendants have violated fiduciary duties of care, loyalty, good faith, candor and independence owed to Galena and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of Galena and its shareholders.

130.    As demonstrated by the allegations above, the Compensation Committee Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Galena and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding the suspiciously time November 2013 option grants.

131.    By reason of the foregoing acts, practices and course of conduct, the Compensation Committee Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Galena and its public shareholders.

132.    As a proximate result of the Compensation Committee Defendants' conduct, in concert with each other, Galena has been injured and is entitled to damages.

**COUNT VI**
**UNJUST ENRICHMENT AGAINST DEFENDANTS NISI, AHN, SCHWARTZ, KRIEGSMAN, DUNLAP, HILLSBERG, GALLIKER, CHIN AND ASHTON BASED ON THEIR RECEIPT OF ILLICIT OPTION GRANTS**

133.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

134.    As a result of the conduct described above, defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton will be and have been unjustly enriched at the expense of Galena, in the form of the illicit November 2013 option grants.

135.    By their wrongful acts and omissions, defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton were unjustly enriched at the expense

of and to the detriment of Galena.

136.    Plaintiffs, as a shareholders and representatives of Galena, seek restitution from defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them in connection with the illicit November 2013 option grants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Galena to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.    Directing Galena to rescind, cancel or declare void the Clause;

D.    Awarding to Galena restitution from the Insider Selling Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Insider Selling Defendants in connection with their illegal stock sales;

E.      Awarding to Galena restitution from defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by defendants Nisi, Ahn, Schwartz, Kriegsman, Dunlap, Hillsberg, Galliker, Chin and Ashton in connection with their improper option grants;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  March 6, 2015                          Respectfully submitted,

                                               **SLATER ROSS**

                                               /s/ Christopher A. Slater
                                               Christopher A. Slater, OSB # 97398
                                               Michael J. Ross, OSB # 91410
                                               Sovereign Hotel, 4th Floor
                                               710 S.W. Madison Street
                                               Portland, Oregon  97205
                                               Telephone: (503) 227-2024
                                               Facsimile: (503) 224-7299
                                               cslater@slaterross.com
                                               mjross@slaterross.com

                                               *Local Counsel for Plaintiffs*

                                               **THE WEISER LAW FIRM, P.C.**
                                               Robert B. Weiser, PA Bar ID 81575
                                               Brett D. Stecker, PA Bar ID 86242
                                               22 Cassatt Avenue, First Floor
                                               Berwyn, PA 19312
                                               Telephone: (610) 225-2677
                                               Facsimile: (610) 408-8062
                                               rw@weiserlawfirm.com
                                               bds@weiserlawfirm.com

**THE WEISER LAW FIRM, P.C.**
Kathleen A. Herkenhoff
CA Bar ID 168562
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
PA Bar ID 62702
Ligaya Hernandez
PA Bar ID 210229
Hynes Keller & Hernandez, LLC
1150 First Avenue, Suite 501
King of Prussia, PA 19406
Telephone: (610) 994-0292
Facsimile: (914) 752-3041
mhynes@hkh-lawfirm.com
lhernandez@hkh-lawfirm.com

**FEDERMAN & SHERWOOD**
William B. Federman
OK Bar ID 2853
Sara E. Collier
OK Bar ID 20473
10205 N Pennsylvania Ave
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com
sec@federmanlaw.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
NY Bar ID NF1184
369 Lexington Avenue, 10th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Fax: (212) 983-9331
nfaruqi@faruqilaw.com

*Counsel for Plaintiffs*

PAGE 56 - VERIFIED SECOND AMENDED CONSOLIDATED SHAREHOLDER
DERIVATIVE COMPLAINT